IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

MEKAEL DESEAN DANIELS,

    Defendant.

CRIMINAL ACTION FILE NO.

1:23-cr-154-TCB-JKL

## FINAL REPORT AND RECOMMENDATION

Defendant Mekael Desean Daniels is charged in this case with (1) conspiracy to possess with intent to distribute cocaine and fentanyl and (2) possession with intent to distribute cocaine and fentanyl. [Doc. 1.] The charges arise out of Daniels's arrest on December 9, 2022, and the search of a condominium he was renting. The case is before the Court on Daniels's motions to suppress evidence seized from the condo [Doc. 23], statements he made during his encounter with law enforcement that day [Doc. 24], and the contents of cell phones that were seized and later searched [Doc. 25].[1] On March 21, 2024, I held an evidentiary hearing. [Doc. 48.] Afterward, Daniels filed a post-hearing brief [Doc. 51], the government filed a brief in opposition [Doc. 56], and Daniels filed a reply, making the motions

---

[1] Daniels later particularized these motions. [*See* Docs. 33-34.]

ripe for resolution.  [Doc. 64.]  For the following reasons, it is **RECOMMENDED**

that the motions be **DENIED**.

## I.    BACKGROUND

On December 9, 2022, members of the Drug Enforcement Administration's

("DEA") Financial Investigation Team ("FIT") were conducting surveillance at the

Eclipse, a high-rise condominium tower in Atlanta, Georgia, in connection with a

drug-money laundering investigation from another district.  [Doc. 48 at 9-10, 39[2];

*see also* Docs. 43-1 through 43-3.]  During their surveillance agents[3] saw an

individual, later identified as Daniels, acting suspiciously, and shifted their

attention to him.  [Doc. 48 at 13-15; *see also id.*, Ex. 3.]  Based on further

investigation, outlined below, the agents came to believe that Daniels was engaged

in drug trafficking activity out of Unit 907 of the Eclipse where Daniels was living.

The agents gathered information about Daniels using a variety of

techniques—including visual surveillance, interviewing property management,

obtaining and reviewing lease records, and checking Daniels's criminal

---

[2] When citing to this transcript, I will refer to the page numbers provided by the Court's case file database ("CM/ECF") rather than the page numbers listed on the transcript.

[3] Several of the members of FIT were task force officers; however, for the sake of simplicity, the Court refers to them as "agents."

background [*see* Doc. 48 at 10, 18-19, 22-23, 54, 89-90, 93, 97], with many of their efforts reflected in the agents' group WhatsApp chat from that day [*see generally* Docs. 39-1, 39-2 (screenshots of agents' WhatsApp messages)]. In addition, Task Force Officer ("TFO") Michael DeWald, one of the agents on the scene, obtained consent from the property manager of the Eclipse to bring a drug detection dog into the building and its hallways. [Doc. 48 at 97-98.] After obtaining authorization, Sandy Springs Police Officer David Behne, a canine handler, arrived at the Eclipse with his canine, Brutus. [*Id.* at 24.] TFO DeWald and TFO Stephen Miller escorted Officer Behne and Brutus to the ninth floor. [*Id.* at 24, 45.] Brutus was then led down a line of roughly six to eight doors, sniffing each; at some point towards the middle, he alerted on Unit 907, before sniffing a few more doors and returning to Officer Behne. [*Id.* at 46-48.]

Once Brutus alerted to Unit 907, TFO DeWald sought a search warrant for the condo from a state court judge and, in support, submitted an affidavit relaying the following information about the investigation:

- Beginning in November 2022, members of FIT began surveillance on individuals suspected of being involved in a drug trafficking and money laundering organization.

3

- In December 2022, TFO DeWald received information from an "anonymous complainant" that a black male was selling "illicit substances" out of the Eclipse building.

- TFO DeWald, TFO Daniel Garsh, and DEA Special Agent ("SA") Russel Water observed a black male—later identified as Daniels—loitering in the lobby area of the Eclipse and pacing back and forth. Daniels then left the lobby and met with two Asian men who pulled up to the Eclipse in an Acura MDX with New York license plates. He directed the men to park in the Eclipse parking deck. Daniels appeared nervous as he directed them to park.

- After the two Asian men parked, they met Daniels at the front door of the Eclipse. One was carrying a large backpack that seemed heavy. Daniels used his key fob to open the door, glancing around as if to see if anyone was watching, and the three men went inside. As they walked through the lobby, Daniels again appeared to be looking around as if being watched.

- TFO DeWald checked the key activity for the fob and found that it was registered to Unit 907. The "general manager" of the Eclipse showed TFO DeWald a copy of the lease for Unit 907, which showed

4

that it was leased to a Jason Harville.  The leasing information also contained vehicle registration information for a Honda Accord with license place TDU2569, a check of which revealed it was registered to Daniels.  The Georgia driver's license photo for the car's registration matched the black male whom TFO DeWald had observed meeting the Asian men and entering the building.

- Believing that the lease had been obtained fraudulently, TFO Garsh search a law enforcement open-source database, which revealed that Daniels had a criminal history for drug trafficking and was on "federal parole" for trafficking heroin.  The agents also spoke with Daniels's probation officer.

- The agents then deployed a drug detection dog, Brutus, to conduct an open-air sniff of the doors on the ninth floor, where Unit 907 was located.  Brutus alerted for the presence of narcotics at the door of Unit 907.

- Brutus is a seven-year-old Belgian Malinois trained for Narcotics Detection and was certified by National Narcotics Detection Dog association ("NNDDA") on September 17, 2022, to detect marijuana, cocaine, heroin, methamphetamine and MDMA and their derivatives.

He is trained to come to a final response of sitting and staring at the source of an odor, which may indicate items recently contaminated or associated with the odor of one or more of the controlled substances. He had previously performed other inspections and "demonstrated" that he "would not alert unless the drug odor contamination was substantial and/or recent."

[Doc. 23 at 7-12.]

While the agents were waiting on the search warrant to be signed, TFO DeWald began planning for its execution. [Doc. 48 at 88.] One officer was stationed on the ninth floor of the building. [*Id.* at 24.] Three other officers—TFO Miller, TFO Patrick Wolfe, and TFO Daniel Clark—took position on the eighth floor of the building's parking deck near the parking spot associated with Unit 907, Space 133, in case the people occupying Unit 907 came out and attempted to leave. [*Id.* at 17, 20, 23.] A gray Nissan was parked in Space 133; not the white Honda that was associated with Unit 907 and Daniels. [*Id.* at 19, 21; Doc. 43-6, 43-7.]

Later that afternoon, a state court judge issued a warrant to search Unit 907 and any associated vehicles for evidence of drug trafficking and money laundering. [Doc. 48 at 88; Doc. 43-8.] Shortly after the warrant was signed, TFO Miller, who was inside his car on the eighth floor of the parking garage, was notified over the

6

radio that Daniels and two Asian men had left Unit 907.  [Doc. 48 at 25-27.]  A few seconds later, TFO Miller saw Daniels and the Asian men in the parking deck walking toward the Nissan parked in Space 133.  [*Id*. at 26-27.]  TFO Miller notified the other agents that the men were coming out and that he would detain all three pending the execution of the warrant.  [*Id*. at 26.]  He put on his car's lights, backed the car up, and pulled in front of the Nissan parked in Space 133.  [*Id*. at 27.]  TFO Miller then got out of his car, drew his weapon, and told the men to put their hands up.  [*Id*. at 27-28.]  The Asian men immediately complied; Daniels took a little more time but then did so as well.  [*Id*. at 28.]

By this time, other agents had arrived on the scene.  [Doc. 48 at 28.]  TFO Miller went to the passenger side of Nissan where the Asian men were located.  [*Id*. at 29-30.]  He held the scene until TFO Wolfe arrived and took control of Daniels.  [*Id*. at 30.]  TFO Wolfe also had his weapon drawn.  [*Id*. at 34.]  Once all three men were detained, TFOs Miller and Wolfe holstered their weapons; neither they nor any other officer on the scene drew them again while in the parking deck.  [*Id*. at 30, 35-37.]  Daniels and the two Asian men were then placed in handcuffs.  [*Id*. at 30, 35.]

Meanwhile, TFO DeWald was in the property manager's office, and when he heard that the three men had been detained, he quickly made his way to the

7

scene. [Doc. 48 at 88, 92-94.] When he arrived, he saw the two Asian men on the passenger side of the Nissan, and Daniels standing next to the driver's side. [*Id.* at 94.] TFO DeWald approached Daniels and, without giving a *Miranda*[4] warning, asked Daniels where he lived. [*Id.* at 81-82, 94.] Daniels responded, "I came from 907, my residence." [*Id*. at 94.] Because Daniels claimed to live in Unit 907, TFO DeWald explained that a drug detection dog alerted to the presence of drugs in Unit 907, that he had a warrant to search the Unit, and that he had spoken to Daniels's federal parole officer. [*Id.* at 95.] But before TFO DeWald could ask anything else, Daniels stated that he was "done" and was going back to prison. [*Id.*] TFO DeWald explained that agents had not yet searched the Unit, and Daniels responded that "[i]t doesn't matter." [*Id.*] Daniels then stated that his girlfriend was in the Unit and that he was concerned about her safety. [*Id.*] Finally, he gave agents the key to the Unit. [*Id.*] After obtaining this information and the key, TFO DeWald proceeded to put together an ad hoc team to execute the warrant, and they headed to Unit 907. [*Id.* at 95, 115.] In all, TFO DeWald estimated that his interaction with Daniels lasted a matter of minutes. [*Id.* at 37.]

Daniels remained in the parking garage with other FBI agents. [Doc. 48 at 73.] The parking garage is an open-air structure, and with a soccer game being

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

televised at a nearby bar, cheers could be heard.  [*Id.*]  At some point, a woman was also heard screaming outside.  [*Id.*]  Upon hearing her scream, Daniels became distressed and concerned—apparently, his girlfriend had diabetes and anxiety, and he was worried about her safety.  [*Id.* at 73-74, 79.]  After that, without prompting by any of the agents, Daniels also "said that the stuff in the apartment was his." [*Id*. at 74.]  Once Daniels made that statement, FBI Special Agent Martin Highsmith provided him with a *Miranda* warning, and assured him that law enforcement would not hurt his girlfriend.  [*Id.* at 74-75, 79.]  Daniels acknowledged his rights and his willingness to waive those rights, and he continued to speak to SA Highsmith.  [*Id*. at 75-76.]

Additional facts are discussed as necessary in the analysis that follows.

## II.    MOTIONS TO SUPPRESS EVIDENCE

Daniels moves to suppress the evidence seized from Unit 907, arguing that (1) the warrant application did not establish probable cause because it omitted material information about Brutus's qualifications; (2) the warrantless dog sniff outside Unit 907 violated the Fourth Amendment and, because TFO DeWald used the positive dog alert to obtain the warrant, the resulting evidence must be suppressed as fruit of the poisonous tree; (3) the warrant was not sufficiently particularized; (4) the good faith exception does not apply because of the

deficiencies of the warrant; and (5) he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), because the warrant application omitted material information.  [Docs. 33, 51.]

The government opposes each of these arguments.  First, it argues that Daniels lacks standing[5] to challenge the search because he had no reasonable expectation of privacy in Unit 907.  [Doc. 56 at 17-25.]  It also argues that the warrant application established probable cause, that the dog sniff did not violate the Fourth Amendment, that the warrant was sufficiently particularized, and that Daniels has not made a sufficient preliminary showing that a *Franks* hearing is warranted.  [*Id.* at 25-43.]

On reply, Daniels contends that (1) the government trespassed upon his home's curtilage via the dog sniff; (2) his expectation of privacy in Unit 907 was objectively reasonable; (3) the evidence supporting the warrant was neither legally obtained nor sufficient to establish probable cause; (4) because TFO DeWald made false statements and omitted material facts in the warrant application, he is entitled

---

[5] In this context "standing" refers to "threshold issue" of "whether an individual has a reasonable expectation of privacy in the object of the challenged search.  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020).  It is not to be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.  *Byrd v. United States*, 584 U.S. 395, 410-11 (2018).

10

to a *Franks* hearing; and (5) the good faith exception does not apply because the issuing judge was "misled" and "provided with manufactured evidence." [Doc. 64 at 3-25.]

In the discussion that follows, the Court first addresses the issue of standing, and then takes up the parties' arguments about probable cause and the sufficiency of the search warrant.

### A.      Daniels's Standing to Challenge the Search of Unit 907

To provide necessary context, the Court starts its discussion of standing by summarizing Daniels's connection to Unit 907.

### 1.      Background

In 2012, Daniels was convicted of heroin trafficking and sentenced to a 143-month term of imprisonment, followed by eight years of supervised release. *See United States v. Daniels*, No. 1:10-cr-269-TCB-AJB, Dkt. No. 80 (judgment and commitment order). His co-defendant in that case, Shawn Peeples, was also convicted for heroin trafficking and received a sentence of 69 months, also followed by eight years of supervised release. *Id.*, Dkt. No. 81 (judgment and commitment order for Peeples). At the time of Daniels's arrest in December 2022, he was still on supervised release for his federal conviction. [Doc. 48 at 135.] The conditions of his supervised release required him to notify his supervising

probation officer within 72 hours of any change to his residence.  [*Id.* at 126]; *see also Daniels*, No. 1:10-cr-269-TCB-AJB, Dkt. No. 80 at 4.

After his release from prison, Daniels lived with his girlfriend in Dallas, Georgia.  [Doc. 48 at 136.]  In October 2022, he decided that due to traffic, he wanted to live in "downtown" Atlanta, and contacted Peeples to help find a place to live.  [*Id.* at 135, 137.]  Peeples then introduced Daniels to someone—identified only as "Jason"[6]—who could lease Daniels an apartment.  [*Id.* at 128, 135.]

According to Daniels, Jason told him that Daniels's felony conviction would be discovered by a background check and that the landlord would not lease to him. [Doc. 48 at 129.]  As a result, they arranged for Jason to sublet Unit 907 to Daniels in order to avoid placing Daniels's name on the lease.  [*Id.*]  But Jason himself obtained the underlying lease by fraudulently submitting the identifying information for a Jason Harville.[7]  [*Id.* at 116-119; *see also* Doc. 45-2 (email chain).]  The real Jason Harville, however, did not lease Unit 907, did not authorize anyone to lease Unit 907, and did not give anyone permission to lease Unit 907 in his name.  [Doc. 48 at 119.]

---

[6] As noted above, a "Jason Harville" was listed on the lease for Unit 907. [Doc. 23 at 7-12.]

[7] Daniels never saw the full lease agreement between Jason and the landlord; Jason only showed him the signature page of the lease.  [Doc. 48 at 128.]

Daniels moved into Unit 907 at the end of October 2022. [Doc. 48 at 131.] On the day he moved in, Daniels met Jason at the Eclipse; Jason then went inside and made arrangements with management while Daniels readied his furniture. [*Id.*] Jason thereafter emerged from the Eclipse with a concierge, and Jason and Daniels moved the latter's furniture into Unit 907. [*Id.*] At some point, Jason gave Daniels the key fob and key to Unit 907 in the concierge's presence, but Daniels did not introduce himself to management, explain that he was moving into the Unit, or otherwise disclose to management that he was taking over the lease for Jason Harville. [*Id.* at 130, 134.] Daniels also did not tell his supervising probation officer that he was living at Unit 907. [*Id.* at 126.] Although Jason's rent was only $2,000 per month, Daniels paid Jason $2,600 per month for Unit 907, and to do so, Daniels either met Jason behind the Eclipse or traveled to an address off Roswell Road. [*Id.* at 128-29; *see also* Doc. 45-1 (Jason's lease).]

At the time of his arrest on December 9, 2022, Daniels's personal belongings, including prescription medication and furniture, were located in Unit 907. [Doc. 48 at 122-23.] Daniels's car was also registered for the parking space assigned to the Unit. [*Id.* at 124.]

### 2.    Whether Daniels Has Established Standing

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  A defendant alleging an unconstitutional search under the Fourth Amendment must establish *both* a subjective *and* an objective expectation of privacy in the location that was searched. *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995) (citation omitted). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* (cleaned up).  "Under the objective prong, the proper inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.* at 1329 (cleaned up).

Daniels argues that he has standing to challenge the search of Unit 907 because "he lived there and paid rent . . . in full view and with the tacit permission of the building management."  [Doc. 51 at 4.]  As he observes, he had a key fob giving him and his guests access to the condo and other areas of the building, his car was parked in the residents-only area of the parking garage, and his girlfriend told agents that Daniels lived there and had recently moved in.  [*Id.* at 6.]  He also

14

contends that it is immaterial that the person from whom he was subletting the condo, Jason, fraudulently leased the condo, because when Jason subleased the property to Daniels, he was acting with "apparent authority" under which he could lawfully sublease it. [*Id.* at 7.] Indeed, according to Daniels, Jason showed him the lease; collected rent; authorized access to the building and the Unit; and arranged for and was present with Daniels when he moved into the building. [*Id.* at 7-8.]

The government counters that Daniels had no objectively reasonable expectation of privacy in the condo because Jason fraudulently obtained the lease and, as a result, neither he nor Daniels had a valid leasehold or even the right to be on the property. [Doc. 56 at 20-22.] The government also points out that Daniels knew he could not legitimately lease Unit 907 because of his criminal history and that he attempted to circumvent this restriction by "concocting a plan" wherein Jason would lease Unit 907 but Daniels would live there.[8] [*Id.* at 23.] The government observes that Daniels never received a copy of Jason's lease or even read it, never told his probation officer that he was living there, and never identified

---

[8] For the trouble of subletting to him, Daniel paid Jason an extra $600 each month beyond the cost of the underlying lease. [*Compare* Doc. 48 at 127 *with* Doc. 45-1.]

himself as the person subleasing Unit 907; and according to the government, that all suggests that he knew he was not legitimately living at the Eclipse. [*Id*. at 23-24; Doc. 48 at 128, 134.] Finally, the government argues that, even if he believed he was lawfully living in Unit 907, that belief was not objectively reasonable because it violated the terms of his supervised release. [Doc. 56 at 25.]

Applying the subjective component of the two-prong analysis here, the Court finds that Daniels has met his burden of showing he had a subjective expectation of privacy in Unit 907. At the time of the search in December 2022, he had been residing in the Unit for months, he had keys to the Unit and fob for the building, his personal belongings and furniture were there, and he was paying rent. This is enough. *See United States v. Parks*, No. 1:06-CR-0076-RWS-AJB, 2007 WL 9676899, at *6 (N.D. Ga. Nov. 20, 2007), *report and recommendation adopted*, 2008 WL 11383872 (N.D. Ga. Mar. 3, 2008); *see also United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (suggesting that there would be an interest in privacy when there was evidence "that [the defendant] was the tenant or had an unrestricted right of occupancy or control in the apartment at the time of the search").

Whether Daniels had an objectively reasonable expectation of privacy under the second prong is a closer call. The government makes an appealing argument

16

that Daniels rented Unit 907 with full knowledge that he was not authorized to live there, and either knew or should have known that the underlying lease was the product of deception.  But the government does not have any Eleventh Circuit authority that has confronted these (or similar) facts and determined that such deception undermines an objective expectation of privacy, and the Court has not uncovered any such decision in its own research.  The Seventh Circuit, however, has engaged with similar facts in *United States v. Thomas*, 65 F.4th 922 (7th Cir. 2023).

In *Thomas*, the defendant, a fugitive, leased a condo in Atlanta using a fictitious identity, ostensibly to avoid apprehension on pending criminal charges. *Thomas*, 65 F.4th at 923.  Agents tracked him to the condo and obtained consent from the landlord to enter and search the unit, where they found contraband. *Id.* The defendant moved to suppress the evidence seized from the condo, arguing that the landlord could not consent to the search of the leased property and that he had a reasonable expectation of privacy in the unit. *Id.*  In response, the government conceded that the lease gave Daniels a subjective expectation of privacy in the condo but argued that he had no objectively reasonable expectation—that is, one that society is prepared to recognize as reasonable—because he had procured the lease by fraud, a crime under Georgia law. *Id.*  But, contrary to the government's

17

argument in this case, the Seventh Circuit sided with the defendant, reasoning that

under Georgia law, a landlord must use the eviction process to remove a lessor who

obtained the lease through deception; and thus the defendant had at least an

"interim" expectation of privacy in the unit:

> A tenant in Georgia who deceives or even defrauds a landlord is
> entitled to retain possession of the residence until (1) the landlord
> has provided notice to the tenant and filed an affidavit in state court,
> (2) the court has issued a dispossessory warrant, (3) the tenant has
> had the opportunity to file an answer, and (if an answer is filed) (4)
> the court has held a hearing.  If the landlord fails to comply with
> these steps, then the tenant can pursue a tort claim for wrongful
> eviction.  Other actions intended to remove the tenant from the
> property, such as cutting off electricity or water, trigger fines.

*Id.* at 924 (citations omitted).  Based upon the foregoing, the court reasoned that it

did "not matter that [the defendant] knew that he had deceived his landlord in

obtaining the lease.  Georgia has codified his expectation that his tenancy could not

be revoked without notice and an opportunity for judicial process, which means

that his expectation of privacy in the interim is one that society recognizes as

reasonable." *Id.*

The case at bar is somewhat different than *Thomas*, but only in that the

present case involves two layers of fraud:  one involving Jason's fraudulent lease

and the other involving Daniels's sublease.  Still, the reasoning of *Thomas* holds

force.  The Supreme Court has emphasized that "property concepts are instructive

in determining the presence or absence of the privacy interests protected by [the Fourth] Amendment," *Byrd*, 584 U.S. at 403, and the tenant protections detailed in the *Thomas* decision and enshrined in Georgia law would apply to Daniels's sublease. As the court explained in *Thomas*, the landlord of Unit 907 would not be able to resort to self-help to remove Daniels (or Jason), but would instead have to avail himself of the eviction process. The natural consequence of that is that Daniels had an expectation of privacy in Unit 907, even if his presence in the Unit was tainted by fraud and illicit purpose, that society recognizes.

The cases that the government cites to the contrary are distinguishable. [*See* Doc. 56 at 22.] Citing to *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978), the government likens Daniels to a "burglar plying his trade in a summer cabin during the off season," whose expectation of privacy "is at all times unreasonable." [Doc. 56 at 20 n.11.] But Daniels is not in the same class as a burglar; he was paying rent to Jason, who, in turn, appears to have paid the actual landlord. Next, *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005), also fails to support the government's position, because (1) the defendant in that case, a guest of a squatter, "never once slept at the residence as an overnight guest"; (2) "the house was dilapidated and unlivable, making it unlikely that it served any residential function"; (3) no evidence linked the defendant to the residence; and (4) there was

19

no evidence that the squatter himself had a lease—even fraudulently—and so there were no comparable property interests to the present case.  In *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787 (9th Cir. 1994), meanwhile, a Section 1983 civil rights case brought by a plaintiff who was the guest of squatters challenging his arrest and prosecution, the court found no expectation of privacy because the property owners had explicitly denied the squatters' request to live on the property and formally alerted the squatters they were trespassing.  Here, by contrast, Daniels paid rent and no action had been taken to challenge Daniels's occupancy of Unit 907.  Finally, in *United States v. Ortiz*, 507 F. App'x 339, 342-43 (5th Cir. 2013), the Fifth Circuit found that a defendant had no objectively reasonable expectation of privacy in a house he supposedly leased from a distant relative because the defendant spent only a few hours at the residence before his arrest, never stayed overnight there, and used the house as "simply a place to do business" (*i.e.,* traffic drugs).  Daniels, of course, resided at Unit 907.

In the end, even though Daniels lacked an enforceable property interest in Unit 907 and lived there in violation of the conditions of his supervised release, the Court finds that he still had a subjective and objective expectation of privacy in the Unit based on his residency there and the protections Georgia law affords tenants.  Accordingly, the Court finds that he has "standing" to challenge the search.

20

### B.    The Search of Unit 907

Having found that Daniels has standing to challenge the search of Unit 907, the Court now takes up his arguments that the search itself amounted to a Fourth Amendment violation.  In the discussion below, the Court first addresses whether the warrant application established probable cause to search Unit 907—in particular, whether the open air dog sniff violated the Fourth Amendment—and whether Daniels's request for a *Franks* hearing should be granted.  [Doc. 33 at 7-16.]  The Court then turns to Daniels's argument that the warrant itself was defective because it was not sufficiently particularized.  [*Id.* at 16.]  Finally, the Court addresses whether the good faith exception to the exclusionary rule applies under the present facts.  [*Id.* at 17.]

### 1.    The Warrant Was Supported By Probable Cause

Establishing probable cause "is not a high bar" and instead "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act."  *Kaley v. United States*, 571 U.S. 320, 338 (2014) (internal quotations omitted) (cleaned up).  The task of the issuing judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

21

When reviewing a search warrant after the fact, the Court will uphold the determination of the issuing judge so long as he or she had a "substantial basis" for concluding that probable cause existed. *Id.*; *see also United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013), *overruled on other grounds by Ruan v. United States*, 597 U.S. 450 (2022).

Relevant to this case, "[a] drug detection dog's alert can provide probable cause to conduct a search." *United States v. Braddy*, 11 F.4th 1298, 1312 (11th Cir. 2021) (citing *Florida v. Harris*, 568 U.S. 237, 246-48 (2013) and *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993)). There is no "strict evidentiary checklist" to assess a drug-detection dog's reliability; instead, the relevant inquiry is whether "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 244, 248. According to the Supreme Court:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Id.* at 246-47.

22

In his affidavit in support of the warrant for Unit 907, TFO DeWald wrote that Brutus, a trained narcotics detection dog who had recently been certified by the NNDDA, alerted to the presence of narcotics within Unit 907. [Doc. 23 at 11-12.] Under *Harris* and *Braddy*, this alone was enough to provide probable cause to believe that the Unit contained evidence of drug trafficking. And even if it were not, TFO DeWald also set out in his affidavit that (1) Daniels had met with two men whom he did not appear to know; (2) when Daniels invited them into the Eclipse, he looked around as if trying to determine whether they were being watched; (3) the bags that the men were carrying were consistent with drug trafficking and money laundering transactions; (4) Daniels had a criminal history that that included drug trafficking; (5) Daniels's probation officer confirmed that he was on supervised release for heroin trafficking; and (6) Daniels was subletting the apartment from someone named "Jason," who had himself obtained the lease under false pretenses. [*Id.* at 11.] In combination with the dog sniff, these facts are sufficient to establish probable cause to believe that criminal activity was occurring within Unit 907 and that evidence of drug trafficking would be found there.

Daniels nevertheless argues that the warrant application did not provide enough information about Brutus's training, such that the reviewing judge "had no

23

ability to assess the reliability of the dog's alert as a basis for probable cause." [Doc. 33 at 14.] The Court disagrees. The affidavit made clear that Brutus was a seven-year-old Belgian Malinois; was trained to detect the odor of controlled substances, including marijuana, cocaine, crack cocaine, heroin, methamphetamine, and MDMA; and had been certified by the NNDDA on September 17, 2022 on the odors of marijuana, cocaine, heroin, methamphetamine. [Doc. 23 at 11-12.] No more information was necessary. *See United States v. Trejo*, 551 F. App'x 565, 570 (11th Cir. 2014) (a court may presume that a dog's alert provides probable cause where the dog was certified by a bona fide organization or had recently and successfully completed a training program) (citing *Florida v. Harris*, 568 U.S. 237, 247 (2013) and *United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982)).

For these reasons, the Court finds that TFO DeWald's affidavit was sufficient to provide probable cause to search Unit 907.

### 2. The Warrantless Dog Sniff Outside the Door of Unit 907 Did Not Violate the Fourth Amendment

Advancing a fruit-of-the-poisonous tree argument, Daniels contends that the warrantless dog sniff of the doorway to Unit 907 itself violated the Fourth Amendment, and that the resulting evidence seized pursuant to the warrant must be suppressed. [Doc. 33 at 10-14.] The government counters that running Brutus

down the hallway in front of Unit 907 did not illegally invade the curtilage of the condo, and even if it did, the building concierge gave permission to law enforcement to deploy the dog in the corridor. [Doc. 56 at 29-33.] On reply, Daniels contends that when the drug dog "got his nose right up to the door," the dog was within the boundaries of the Unit, and his sniff and subsequent alert amounted to a trespass in violation of the Fourth Amendment. [Doc. 64 at 3-8 (citing *Florida v. Jardines*, 569 U.S. 1 (2013)).] Daniels maintains that he had an objectively reasonable expectation of privacy in the Unit, including the doorway. [*Id.* at 8-11.]

The Fourth Amendment guarantees "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *United States v. Maxi*, 886 F.3d 1318, 1326 (11th Cir. 2018) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "Nowhere is this more true, and important, than in the context of the search of a 'home'—the 'first among equals' in Fourth Amendment land." *United States v. Cooks*, 920 F.3d 735, 741 (11th Cir. 2019) (citing *Jardines*, 569 U.S. at 6). "A home's curtilage, the private property immediately adjacent to a home, is entitled to the same protection against unreasonable search and seizure as the home itself." *Maxi*, 886 F.3d at 1326 (citation omitted). "Because the

25

curtilage is a constitutionally protected space, the police must have an express or implied license to be there without a warrant." *Id.*

The determination of whether an area is part of the curtilage "turns on four fact-intensive inquiries: (1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation." *United States v. Bruce*, 977 F.3d 1112, 1121 (11th Cir. 2020) (citation and marks omitted); *see also United States v. Dunn,* 480 U.S. 294, 301 (1987). The Supreme Court has cautioned that these factors are not a "finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Dunn*, 480 U.S. at 301. Instead, "they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*; *see also United States v. Stephen*, 823 F. App'x 751, 754 (11th Cir. 2020) (citing *Dunn*).

Before proceeding further in the analysis, it is important to note that there are two related conceptions of Fourth Amendment "standing" at play here. The first looks to whether law enforcement officers unlawfully invaded an area in which an individual has a property interest—essentially a trespass-based approach based

on an individual's property rights. *See Jardines*, 569 U.S. at 5. The second approach looks more generally to whether the government has violated an individual's reasonable expectation of privacy—a privacy-based approach. *See Katz v. United States*, 389 U.S. 347 (1967). The Supreme Court's decision in *Jardines*—where the Court focused on the physical intrusion into a constitutionally protected area—illustrates this distinction, along with the limits of its application to the present case. In *Jardines*, police officers entered the defendant's property accompanied by a drug detection dog and crossed onto his front porch, after which the dog alerted at the front door. *Jardines*, 569 U.S. at 4. The Court's majority held that the use of the dog was a search under the Fourth Amendment precisely because the front porch was within the curtilage of the home—a constitutionally protected area that the police entered through an "unlicensed physical intrusion"— that is, deploying a drug dog to find incriminating evidence. *Id.* at 7-9. And while the majority also acknowledged that "property rights are not the sole measure of Fourth Amendment violations" and that under *Katz* and its progeny, a search may also occur if the government intrudes on an individual's reasonable expectation of privacy; the opinion explicitly declined to decide whether the investigation of the defendant's home violated his expectation of privacy. *Id.* at 5, 10-11.

The *Jardines* decision is unhelpful to the present facts precisely because it was decided on this trespass and property-rights approach using the curtilage analysis.    As the Third Circuit has observed, because an apartment "tenant generally takes the property as he finds it, with or without fencing or other types of obstructions in place," the multi-factor curtilage analysis is "not as useful analytically as [it is] in other settings." *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992).  Although the undersigned has located no Eleventh Circuit case law evaluating this issue, other courts have largely concluded that a common hallway and area in front of an apartment door do not qualify as the curtilage of any individual unit. *See, e.g., United States v. Makell*, 721 F. App'x 307, 307-08 (4th Cir. 2018) (unpublished) (holding that common hallway of apartment building, including the area in front of the defendant's door, were not within the curtilage of his apartment); *United States v. Bain*, 155 F. Supp. 3d 107, 121 (D. Mass. 2015) (concluding area in front of an apartment door did not constitute curtilage because it was not a separate area subject to the tenant's exclusive control); *United States v. Penaloza-Romero*, No. CRIM. 13-36 RHK/TNL, 2013 WL 5472283, at *7 (D. Minn. Sept. 30, 2013) (finding that common hallway was not curtilage because the hallway was used by residents for ingress and egress and an individual resident "would most likely not be permitted to shield his activities in the hallway from the

28

other residents, as they have the same right to access it that he does"); *see also, e.g.,* *Stephen*, 823 F. App'x at 755 (duplex driveway, which was "common area used by the residents of both units" and "formed part of the path that visitors would naturally take to walk to the front door" was not part of curtilage); *Fixel v. Wainwright*, 492 F.2d 480, 484 (5th Cir. 1974) (suggesting that "a corridor to salesmen or other businessmen who might approach [apartment] tenants" would not amount to curtilage); *cf. Maxi*, 886 F.3d at 1327 (holding that officers breached curtilage of duplex by taking up tactical positions around partially gated exterior perimeter of the building and front door).

Applying the relevant factors here, the Court finds that Daniels has not established the common hallway or the exterior doorway area constitute curtilage. While both are close in proximity to Unit 907, the remaining factors counsel against finding it to be curtilage: neither area is within any sort of common enclosure for the Unit, Daniels did not have exclusive control over either area such that he could exclude others, and he could not (and did not) block those areas from observation. [*See, e.g.*, Doc. 48 at 99 (tenants are not allowed to have doormats, doorbell cameras, or anything else in the hallway).] Based on these factors, the Court cannot conclude that the hallway and exterior door area "harbors the activity associated with the sanctity of a man's home and the privacies of life" such that it should be

deemed part of the apartment's curtilage.  *Stephen*, 823 F. App'x at 754 (quoting *Dunn*, 480 U.S. at 300).  And because those areas are not curtilage, the agents did not commit a trespass—which is to say that they did not invade an area in which Daniels had a recognized, constitutionally protected property interest—when they deployed Brutus in the hallway and in the vicinity of Unit 907.

Daniels's arguments to the contrary are not persuasive.  He contends that the hallway and area outside his door is analogous to a sidewalk leading to the front door of a townhouse, which the Eighth Circuit held was curtilage in *United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016).  But *Hopkins* is factually distinguishable because, in that case, there was "no 'common hallway' which all residents or guests must use to reach their units"; the defendant's "door faced outside, and the walkway leading up to it was 'common' only to [the defendant] and his immediate neighbor," who did "not pass within 6 to 8 inches of [the defendant's] door when going to his own."  *Id.*  In this case, by contrast, the Unit opened to a common hallway that was accessible to each resident on the floor, and, as discussed, Daniels had no ability to place anything outside the door or in the doorway area, much less enclose it or otherwise protect it from observation.

Daniels also contends that the door and the space immediately before it were within an enclosure because the Unit was in an access-restricted hallway.  [Doc. 64

30

at 16.] But "the question is not whether the area at issue was within the walls of the building, but whether it was enclosed and intimate to [the defendant's] apartment itself." *United States v. Sweeney*, 821 F.3d 893, 902 (7th Cir. 2016). Although Daniels's front door might not have been open to the public writ large, it was still accessible to any resident of the floor, if not the building. He also argues that the door was within the Unit's curtilage because it was used for "protection and privacy" and he locked the door to secure his personal property. [Doc. 64 at 16-17.] But the fact that Daniels could exclude people from the *interior* of the Unit does not bear on the *exterior* of the door and the area around it, much less establish that he took steps or in fact prevented anyone from accessing or observing any area outside the door.

Finally, citing *Jardines*, Daniels contends that even if the agents had a license to approach the Unit door in a common hallway, they had no license or invitation to deploy a drug dog. But this argument ignores that the Eclipse's property manager in fact granted permission to bring a drug detection dog into the building and its hallways. [Doc. 48 at 97-98.] Thus, unlike the officers in *Jardines*, the agents and Brutus were "lawfully in the apartment building because property management granted them access to conduct their investigation." *United States v. Peck*, No. 8:20CR227, 2022 WL 1588258, at *5 (D. Neb. Feb. 22, 2022), *report*

*and recommendation adopted*, 2022 WL 1224963 (D. Neb. Apr. 26, 2022).  Thus, Daniels's argument on this point fails.

In sum, Daniels has not carried his burden to show that the common hallway or front door area of Unit 907 qualified as curtilage under the four-factor test set out by the Supreme Court in *Dunn*.  But, as discussed above, the Court's Fourth Amendment analysis does not end there, because even if agents did not trespass into the curtilage of Unit 907, the dog sniff could still constitute a search if it violated Daniels's "reasonable expectation of privacy."  *Katz*, 389 U.S. at 360, (Harlan, J., concurring).

The Eleventh Circuit addressed a tenant's expectation of privacy in common areas of a large, multi-unit complex in *United States v. Miravalles,* where the court held that "tenants in a large, high-rise apartment building, the front door of which has an undependable lock that was inoperable on the day in question," have no "reasonable expectation of privacy in the common areas of their building."  280 F.3d 1328, 1333 (11th Cir. 2002).  The holding in *Miravalles* was narrow and limited to the facts of that case, where the building had an electronic lock system for the front door of the building that was not functioning on the day of the search, which thereby allowed tenants and non-tenants alike to enter the building.  *Id.*  In reaching its decision, the court surveyed other circuits' decisions that had addressed

32

the issue, and observed that five circuits had concluded that tenants do not have a reasonable expectation of privacy in the common areas of their apartment building, because "tenants have little control over those areas, which are available for the use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers, and the like." *Miravalles*, 280 F.3d at 1331-32 (citing *United States v. Nohara*, 3 F.3d 1239, 1241-42 (9th Cir. 1993); *United States v. Concepcion*, 942 F.2d 1170, 1171-72 (7th Cir. 1991); *United States v. Barrios-Moriera*, 872 F.2d 12, 14-15 (2d Cir. 1989)[9]; *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977); and *United States v. Cruz Pagan*, 537 F.2d 554, 558 (1st Cir. 1976)). The court also differentiated between apartment complexes and single-family residences, explaining that "[t]he reasonableness of a tenant's privacy expectation in the common areas of a multi-unit apartment building stands in contrast to that of a homeowner regarding the home and its surrounding area, over which the homeowner exercises greater control." *Id.* at 1332.[10]

---

[9] *Overruled on other grounds by Horton v. Cal.*, 496 U.S. 128 (1990).

[10] The court also cited and declined to follow a Sixth Circuit decision, *United States v. Carriger*, 541 F.2d 545, 550-52 (6th Cir. 1976), which recognized "it is reasonable for tenants to expect privacy in the common areas of their apartment building, at least when the building is locked" because "it is reasonable for them to expect that the general public or trespassers (including law enforcement officers) will be excluded." *Miravalles*, 280 F.3d at 1332.

Since *Miravalles* came down, the Third Circuit has joined the other circuit courts, holding "that a resident lacks an objectively reasonable expectation of privacy in the common areas of a multi-unit apartment building," and finding that to be the case even "with a locked exterior door" to the building in place. *United States v. Correa*, 653 F.3d 187, 190-91 (3d Cir. 2011) (collecting circuit decisions finding no expectation of privacy in common areas of multi-unit apartment buildings, even when such buildings have a locked exterior door). The only precedent the *Miravalles* court cited that is binding on this Court was a former Fifth Circuit decision, *Fixel v. Wainright*, 492 F.2d 480 (5th Cir. 1974), which held that tenants in a four-unit apartment building had a reasonable expectation of privacy in their fenced-in yard that was behind the building, away from the street. *Miravalles*, 280 F.3d at 1132. As noted above, the *Fixel* court nevertheless suggested that a common hallway used by tenants, guests, and solicitors, would not be constitutionally protected, and the *Miravalles* court specifically observed that the enclosed backyard was *not* like a common hallway used by tenants to access their units, as the yard was inaccessible to outside visitors that might otherwise "approach the tenants." *Id.* (quoting *Fixel*, 492 F.2d at 484).

In the undersigned's view, the upshot of *Miravalles* and related authority, such as *Correa*, is that whether tenants have a reasonable expectation of privacy in

34

the common areas of a multi-unit residential building is context-dependent and must be resolved in reference to the specific circumstances of each case.  Some factors clearly relevant to this determination include:  the number of units and residents in the building, whether the building is locked or otherwise inaccessible to the public, whether specific common areas within the building are somehow restricted, the extent to which non-residents have the ability to observe, access, and/or utilize the common areas of the building, and whether the defendant had authority to exclude or in fact excluded people from any particular area.[11]

---

[11] In *United States v. Leake*, then-District Judge Ketanji Brown Jackson identified similar factors at play when determining a tenant's reasonable expectation of privacy in common areas of a multi-unit residential complex:

> [T]he Supreme Court has not addressed directly whether there is a reasonable expectation of privacy in communal areas of a multi-unit dwelling.  However, the weight of circuit-level authority holds that a tenant does not have a reasonable expectation of privacy in the common areas of such a building.  This holding is typically reached after a fact-intensive inquiry about the particular spaces at issue, but whether or not a tenant can exclude others from accessing the common areas, and whether the common areas are open to either the general public or at least to guests of other tenants, are often determinative of the reasonable expectation of privacy issue.

No. 19-CR-194 (KBJ), 2020 WL 3489523, at *6 (D.D.C. June 26, 2020) (footnote omitted) (holding that tenant lacked reasonable expectation of privacy in shared laundry room).

Applying those considerations here, the Court concludes that Daniels has not shown that he had a reasonable expectation of privacy in the common hallway or the exterior of the door to Unit 907, largely for the same reasons that those areas are also not curtilage. Although access to the corridor was restricted to those with a key fob, that is not determinative, as such locks are "to provide security to the occupants, not privacy in common hallways" and a valid "expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions." *Eisler*, 567 F.2d at 816. In other words, while key fob access excluded much of the public from the common area and the area around Unit 907's door, it did not give Daniels any actual "control over these areas," and in fact, any resident, as well as their "guests, delivery people, repair workers, postal carriers, custodians, and others," including police, had access to the area—making them essentially "public spaces" that are not entitled to Fourth Amendment Protection. *Correa*, 653 F.3d at 191; *see also Eisler*, 567 F.2d at 816 (observing that the common hallway was "available for the use of residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises"). Beyond that, the building was a "tall high-rise" condominium building—with three floors of retail, several stories of parking deck, and at several more floors of apartments—such that many residents, along with their guests and

36

licensees and other members of the public, all had access to the common area. [*See*
Doc. 48 at 72, 91.] And as discussed, Daniels had no ability to place items in the
common area or outside of his door, and indeed appears to have had no personal
ability to exclude anyone from the area. [*Id.* at 99.] Based upon all of these facts,
the Court concludes that Daniels did not have a reasonable expectation of privacy
in the common hallway or doorway of Unit 907.

The next issue, then, is whether the warrantless dog sniff violated Daniels's
reasonable expectation of privacy, since after all, the sniff itself revealed
information about the interior of the Unit. The starting point for this analysis is the
Supreme Court's holding in *Illinois v. Caballes*—that a "free air" canine sniff
performed on the exterior of a car that was lawfully stopped for a traffic violation
"does not implicate legitimate privacy interests," and thus is not a search under the
Fourth Amendment. 543 U.S. 405, 409 (2005). There, the Supreme Court
reasoned that there was no "legitimate" privacy interest at play because
"government conduct that *only* reveals the possession of contraband compromises
no legitimate privacy interest," and a properly-trained drug detection dog will alert
*only* to contraband. *Id.* at 409 (marks omitted). As the Court explained: "the
expectation that certain facts will not come to the attention of authorities is not the

37

same as an interest in privacy that society is prepared to consider reasonable." *Id.* at 408-09 (marks omitted).

The Eleventh Circuit does not appear to have resolved whether a dog sniff of a residence from an exterior, non-curtilage area constitutes a search under the Fourth Amendment, and there appears to be a circuit split on the issue. In *United States v. Scott*, a pre-*Jardines* decision, the Eighth Circuit concluded that using a drug dog to sniff the door frame of an apartment located in a common hallway is not a search under *Caballes*. 610 F.3d 1009, 1016 (8th Cir. 2010). Explaining its rationale, the court took pains to distinguish another Supreme Court decision in *Kyllo v. United States*, 533 U.S. 27, 34-35 (2001), which held that the use of thermal imaging technology to observe inside a residence was a Fourth Amendment search, on the grounds that a thermal imaging device reveals both lawful and unlawful activity within a residence, while a properly trained drug dog sniff reveals only the presence of illicit drugs. *See Scott*, 610 F.3d at 1016. After *Jardines* was decided, the Fourth Circuit also reached the same conclusion in *United States v. Makeel*, holding that a drug sniff of an apartment door did not constitute a search under the Fourth Amendment because the defendant had no legitimate expectation of privacy in the non-detection of contraband, and the sniff did not detect for any other material or activity. 721 F. App'x at 308.

38

Meanwhile, in *United States v. Whitaker*, the Seventh Circuit found that the "police engaged in a warrantless search within the meaning of the Fourth Amendment when they had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs." 820 F.3d 849, 854 (7th Cir. 2016). The court there leaned into Justice Kagan's approach in her concurrence in *Jardines*, in which she urged that using a drug detection dog to sniff someone's doorway was in fact analogous to the thermal imaging device in *Kyllo* because a dog is a "super-sensitive instrument" that is not in general public use; and because a person enjoys greater protection in his home than he does in his vehicle, *Caballes* should be distinguished. *See Whitaker*, 820 F.3d at 852-53; *see also Jardines*, 569 U.S. 1, 13-15 & n.1 (Kagan, J. concurring). The *Whitaker* court also expressed concern that treating "the front porch of a stand-alone house and the closed hallways of an apartment building [differently] draws arbitrary lines" among types of residences, and that treating multi-unit buildings as having less of a privacy expectation than single-family dwellings may "apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity." *Whitaker*, 820 F.3d at 854.

Although reasonable minds may differ, the undersigned finds the approach of the Fourth and Eighth Circuits more persuasive, largely because that approach aligns better with *Caballes*, which was decided after *Kyllo*. And although *Caballes*

39

involved a dog sniff of a car during a traffic stop, rather than the sniff of a residence, the location of the purported search did not appear determinative to the Court in *Caballes.* Rather, the *Caballes* Court distinguished the thermal imaging in *Kyllo* based the danger that such imaging could show all activity, both legal and illegal, while a properly trained drug detection canine only alerts to contraband. *See* 543 U.S. at 409-10; *see also Kyllo*, 533 U.S. at 35-36 (noting the Court's concern that such "technology that could discern all human activity in the home"). And importantly, *Caballes* is still good law. The majority opinion in *Jardines* did not overrule *Caballes*; instead, it explicitly declined to decide whether using the drug dog violated the defendant's reasonable expectation of privacy—which had the effect of leaving *Caballes* fully intact.[12] *Jardines*, 569 U.S. at 11. Against this backdrop, the Court hesitates to find that a dog sniff beyond a residence's curtilage must be treated differently than the dog sniff of a vehicle. And while the *Whitaker* court's concern about arbitrary distinctions among various types of dwellings is well-taken, the Eleventh Circuit has all but recognized in *Miravalles* that multi-unit dwellings **are** treated differently for Fourth Amendment purposes, **precisely because** a tenant's reasonable expectation of privacy depends on the facts of the

---

[12] And why Justice Kagan's approach—adopted by and implemented in *Whitaker*—was sidelined to a concurrence.

case—including considerations pertaining to the size and layout of a multi-unit complex, the number of units and residents, who had access to which areas, whether the tenant had the ability to exclude anyone, and so on. *See Miravalles*, 280 F.3d at 1331-32. In the end, absent a clear indication from the Supreme Court or the Eleventh Circuit that *Caballes* does not apply to dog sniffs in areas of a residence where an individual has no reasonable expectation of privacy, the Court declines to follow *Whitaker* and instead applies *Caballes*. And based on *Caballes*, the Court concludes that Brutus's sniff in this case did not intrude on Daniels's reasonable expectation of privacy.

In sum, the Court finds that the warrantless dog sniff of the common hallway and door to Unit 907 did not implicate the Fourth Amendment.

### 3. A *Franks* Hearing is Unwarranted

Daniels contends that he is entitled to a hearing under *Franks v. Delaware*, arguing that false statements and material omissions were made in the search warrant affidavit. [Doc. 33 at 10; Doc. 64 at 18-24.] In his motion, Daniels argues that a *Franks* hearing is warranted because TFO DeWald's affidavit did not explain that the agents were initially surveilling the Eclipse in relation to a money laundering investigation. [Doc. 33 at 10.] On reply, he also argues that TFO DeWald falsely stated in his affidavit that Brutus alerted to "the recent and/or

'substantial' contamination" of marijuana from within Unit 907, but that at the evidentiary hearing, he stated that he had only "surmised" that there were drugs inside Unit 907, but did not know the type or quantity. [*See* Doc. 64 at 19-20 (citing Doc. 23 at 11 and Doc. 48 at 115-16).]

Under *Franks*, a defendant may challenge a facially sufficient affidavit if he can show that it contains misrepresentations or omissions that were knowingly or recklessly made. *Franks*, 438 at 155-56, 171. To be entitled to relief, the defendant must show both (1) that the alleged misrepresentations or omissions were knowingly or recklessly made and (2) that excluding the alleged misrepresentations and/or including the alleged omissions would undermine probable cause for the issuance of the warrant. *United States v. Novaton,* 271 F.3d 968, 986-87 (11th Cir. 2001).

Here, Daniels fails to satisfy either requirement. Under the first, Daniels must "make a substantial *preliminary* showing that statements or omissions are intentionally false or recklessly misleading." *United States v. Barsoum*, 763 F.3d 1321, 1329 (11th Cir. 2014) (emphasis in original). But Daniels merely argues by assertion that he has made this showing [*see* Doc. 64 at 22 (acknowledging that a "substantial preliminary showing" is required and stating that "Defendant has proffered sufficient facts to warrant a *Franks* hearing")], but does not ever explain

how any of the misstatements or omissions he identified were "made with the purpose of misleading the judge issuing the warrant." *United States v. Whyte*, 928 F.3d 1317, 1334 (11th Cir. 2019) ("[F]or an omission, deliberateness must also refer to something akin to bad faith on the part of the affiant—not merely that the affiant knew some information and did not include it."). Without something more, Daniels fails to meet this preliminary showing.

But even if he had made that showing, Daniels still does not satisfy the second requirement because none of the information that he contends was misstated or omitted was material—that is, the affidavit would still provide probable cause for the warrant even if each of the alleged misstatements and omissions were corrected. Starting with the agents' reason for being at the Eclipse, the Court agrees with the government that TFO DeWald's statements that "[d]uring the month of December 2022 [he] received information from an anonymous complainant that drug trafficking was being conducted from within and out of the [Unit 907]" and that "there was a black male selling illicit substances from the from the building" were "inartful." [*See* Doc. 56 at 37 n.18.] These statements can be read to suggest that the officers were present at the Eclipse because of a tip about Daniels, as opposed to the other investigation that initially led the agents there. But ultimately it makes no difference to the probable cause determination as to why they were

43

there because the affidavit explains why the agents shifted their attention to Daniels. *See United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir. 1987) ("Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant."). And even if that information were excised, there is still ample information in the affidavit to support probable cause to issue the warrant.

As to Daniels's contention that TFO DeWald should have clarified that Brutus might have alerted to unknown amounts of unidentified narcotics (or possibly even hemp), the Court finds it unpersuasive in light of the other information contained in the warrant affidavit. TFO DeWald knew that Brutus, a trained narcotics detection dog, alerted to some amount of a controlled substance in Unit 907; beyond that, he and the other FIT agents had observed Daniels's suspicious interactions with the two men from out of state; noted that they had a large, heavy bag in their possession; discovered that he was fraudulently subleasing the property; and uncovered his criminal history for drug trafficking—all of which was included in his affidavit. So even assuming that TFO DeWald had relayed to the issuing judge that Brutus might alert to hemp, the totality of the circumstances would still provide probable cause for the search warrant. After all, probable cause does not require certainty, and viewing the foregoing facts together provides probable cause to believe that contraband was inside Unit 907. *United States v.*

*Locke*, No. 22-CR-133, 2024 WL 1343120, at *5 (E.D. Wis. Mar. 28, 2024) ("[P]robable cause requires only a substantial chance of criminal activity, less than a preponderance of the evidence; the mere possibility that [a canine] may have alerted to hemp or CBD, rather than one of the illegal substances he was trained to detect, does not mean the officers lacked probable cause to search.").[13]

For all of these reasons, Daniels is not entitled to a *Franks* hearing.

### 4.    The Warrant Was Sufficiently Particularized

The Court next addresses Daniels's assertion that the warrant was not sufficiently particularized.  The Fourth Amendment requires that a search warrant describe the places to be searched and the things to be seized.  U.S. Const. amend. IV.  The so-called particularity requirement prevents general searches and assures

---

[13] On reply, Daniels contends for the first time that the Court should reopen the evidentiary hearing so that he can challenge the reliability of Brutus's alert and show that TFO DeWald omitted that Brutus might confuse legal hemp for illegal marijuana.  Relying on two law review articles, he contends that "Brutus has not been trained to differentiate between marijuana, which is illegal[,] and hemp." [Doc. 64 at 22.]  However, his citations merely state that some dogs "may have trouble discerning" the two, and that dogs cannot "distinguish the scent of all contraband from otherwise legal substances."  [*Id.* at 23.]  Given the sources' equivocation on the matter the Court declines to accept Daniels's broad pronouncement about drug-detection canines' capabilities, much less Brutus's in particular.  But even assuming that Brutus cannot differentiate among illicit and legal cannabis-related products, that fact would not affect the probable cause determination for the reasons just explained.  Thus, a *Franks* hearing is unnecessary.

the individual whose property is searched and seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Groh v. Ramirez*, 540 U.S. 551, 561 (2004). A warrant that fails to sufficiently particularize the things to be seized is unconstitutionally overbroad, and evidence seized pursuant to such a warrant is subject to suppression under the exclusionary rule. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).

The search warrant in this case authorized law enforcement to seize the following from Unit 907:

> Illegal narcotics, drug related paraphernalia and/or objects, ledgers, objects and items used in the packaging, manufacturing, cultivation, storage, transportation, distribution and/or sales of narcotics/money, proceeds from the sales of narcotics, electronic storage/media devices and their contents, mobile phone devices and their content, safes, firearms and their accoutrements, surveillance video equipment, to include digital video recording hard devices and storage devices[].

[Doc. 43-8 at 1 (search warrant).] Daniels contends that the warrant was overbroad because it permitted the "seizure of items never mentioned in the Affidavit and for which there could be no probable cause." [Doc. 30 at 16.] Daniels does not identify, and it is unclear to the Court, precisely which items he contends the agents lacked probable cause to seize.

In any event, TFO DeWald's affidavit established probable cause to believe that evidence of drug trafficking would be present in the residence, and his affidavit

identified numerous categories of items that, based on his training and experience, are usually involved in drug trafficking.  In *United States v. Pineda*, another Judge in this District explained that:

> Courts have found that items related to drug trafficking, such as, controlled substances; equipment and property used to further drug transactions; records relating to drug transactions and the laundering of drug proceeds; photographs and records of co-conspirators or objects of the criminal activity; proceeds, currency, valuables, and assets and records pertaining thereto, as well as to ownership of the location being searched; and firearms, fall within the scope of the probable cause established to search a location for evidence of drug related criminal activity and that such descriptions of the items to be seized are sufficiently particular given the nature of the crimes being investigated.

No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *7 (N.D. Ga. June 4, 2012) (collecting cases), *report and recommendation adopted*, 2012 WL 2907447 (N.D. Ga. July 16, 2012).  The same goes for the warrant here.  TFO DeWald's affidavit explained that Unit 907 was being used in connection with drug trafficking and that based on his knowledge, training, and experience, drug traffickers often keep large amounts of money available to help maintain and finance their operations, use electronic devices and cell phones in furtherance of their activities, and possess firearms or other weapons to protect themselves and their property.  [*See* Doc. 23 at 8-12.]   The undersigned, following *Pineda*, finds that the warrant was sufficiently particularized to the drug trafficking being investigated.

47

### 5.    The Good Faith Exception Would Preclude Suppression

As recounted above, Daniels makes myriad arguments for suppression of evidence obtained from the search of Unit 907.  But even if the search warrant here were found invalid for any of the reasons that Daniels contends, suppression would not be warranted because the agents executing the warrant reasonably relied in good faith on its validity.  *See United States v. Leon*, 468 U.S. 897 (1984).

In *Leon,* the Supreme Court recognized a good-faith exception to the exclusionary rule for searches conducted pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the exclusionary rule should not be applied, when an officer, acting with objective good faith, has obtained a search warrant from a judge and acted within its scope.  *See Leon*, 468 U.S. at 920-21.  Nonetheless, the *Leon* Court noted four situations in which the suppression of evidence would still be appropriate even if the officer acted in good faith:  (1) when the judicial officer issued the warrant on a deliberately or recklessly false affidavit; (2) when the judicial officer wholly abandons his judicial role; (3) when the warrant was issued on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; or (4) when the warrant is so facially deficient that an officer could not reasonably presume it to be valid.  *Id.* at 923.

48

Here, the agents reasonably relied on the search warrant issued by a state court judge. As to the contents of the affidavit, nothing suggests that it contained any material errors or omissions, much less that TFO DeWald was deliberately or recklessly dishonest. Nor is there any suggestion that the state court judge who issued the warrant abandoned his judicial role. As to probable cause, there was no controlling authority that would have caused the agents to believe that deploying a drug dog down a common hallway in a multi-unit high-rise and with the express permission of building management constituted an unconstitutional search. Indeed, at the time, the weight of authority appears to run counter to Daniels's contention that he had a reasonable expectation of privacy in those areas or that using a canine qualified as a search under the Fourth Amendment. And as to the face of the warrant, a reasonable officer would read the description of property to be seized as limited to evidence of drug trafficking located in the residence. Thus, the officer would not think he or she was executing a general warrant, and any defects in the description of the area to be searched are not so facially obvious that an officer could not reasonably presume it to be valid. *See Leon*, 468 U.S. at 923. For these reasons, the good faith exception to the warrant requirement applies and the evidence seized pursuant to the warrant should not be suppressed.

49

### C.    Summary

For the reasons set forth above, it is **RECOMMENDED** that Daniels's motion to suppress evidence seized from Unit 907 be **DENIED**. [Docs. 23, 33.] It is **FURTHER RECOMMENDED** that his motion to suppress evidence extracted from his cell phone [Doc. 25] also be denied because the sole basis for that motion is that the cell phone evidence was fruit of the poisonous tree.

## III.    MOTION TO SUPPRESS STATEMENTS

Daniels separately moves to suppress both (1) his pre-*Miranda* statement to TFO DeWald that he lived in Unit 907; and (2) his post-*Miranda* statement to SA Highsmith. [Doc. 51 at 10-12.] The Court addresses each in turn.

### A.    Pre-*Miranda* Statement

As noted above, when TFO DeWald first encountered Daniels in the parking garage, he asked Daniels where he lived; and Daniels responded, "I came from 907, my residence." [Doc. 48 at 94.] The government concedes that Daniels was "in custody" for *Miranda* purposes when he made the statement, but argues TFO DeWald's question was lawful under the public safety exception to *Miranda*. [Doc. 56 at 43-47.] The government also argues that, alternatively, the statement is admissible under the inevitable discovery doctrine because information about his residence would have been obtained upon booking. [*Id.* at 48-49.] On reply,

50

Daniels argues that the public safety exception does not apply, as TFO DeWald was not operating under any pressing safety concern, and neither does the inevitable discovery doctrine, as "there was no other source of information for that particular piece of information at that time." [Doc. 64 at 25-28.] Additionally, Daniels argues that no probable cause existed to arrest him when he entered the parking lot, so his subsequent statements were the product of an unlawful arrest and thus fruit of the poisonous tree. [*Id.* at 28-31.] The Court agrees with the government that the public safety exception applies here, and therefore need not decide whether the inevitable discovery doctrine applies.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The Supreme Court has construed this protection to mean that custodial interrogation generally cannot occur before a suspect is informed of his *Miranda* rights." *United States v. Ochoa*, 941 F.3d 1074, 1096 (11th Cir. 2019) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)). The "public safety exception" meanwhile, "allows law enforcement officers to question a suspect without first informing him of his *Miranda* rights when they reasonably believe doing so is necessary to protect either the officers or the public." *Ochoa*, 941 F.3d at 1096-97 (citing *Quarles*, 467 U.S. at 657-59); *see also United States v. Williams*, 784 F. App'x 707, 709 (11th Cir.

2019) (explaining despite its name, the "public safety exception" also applies where there is a threat to law enforcement officers rather than the public).  The inquiry is in an objective one, as the motivations of individual officers are not determinative. *Williams*, 784 F. App'x at 710; *see Quarles*, 467 U.S. at 656 (explaining that "[i]n a kaleidoscopic situation . . . , where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception . . . should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer").

The Court finds that TFO DeWald "reasonably believed that he or his team members could be in danger upon entering the residence," and that it was therefore appropriate to ask Daniels where he lived to protect the officers who were about to execute the search warrant.  *See Ochoa*, 941 F.3d at 1098.  As TFO DeWald explained, law enforcement officers typically try to gather as much information as possible about a premises and its inhabitants before executing a search warrant. [Doc. 48 at 86.]  Important information usually includes the criminal histories of any occupants, whether they are known to be armed or have a propensity for violence, whether there are any dogs inside, whether there are surveillance cameras around to alert those inside that the officers are approaching, and whether there are children or other innocent people inside whose safety could be jeopardized.  [*Id.*]

52

TFO DeWald also testified that multi-family dwellings pose additional safety concerns, as the premises may be on a long hallway with adjacent units, and if a firearm were discharged, the bullet could travel through the wall and into a neighboring apartment.  [*Id*. at 87.]

When TFO DeWald confronted Daniels in the parking deck, the agents had little time to develop a plan to enter Unit 907 to execute the warrant, and did not know whether there was anyone inside Unit 907 who could endanger the safety of officers entering it.  Further, TFO DeWald identified specific concerns he had about the agents' safety, including that Daniels had a criminal history of drug trafficking, aggravated assault, and being a party to a murder [*see* Doc. 48 at 22], and that he was on federal supervision for a drug trafficking offense [*see generally* Doc. 39-1].  The agents' investigation had also uncovered information that caused them to believe that Daniels was trying to conceal his location by living under a fraudulent lease; that two Asian men had been or were still in the Unit; and that a vehicle registered to someone other than Daniels was parked in the Unit's assigned space, suggesting other people might be in the Unit.  [Doc. 48 at 89-90.]  In total, TFO DeWald surmised that there could have be up to five people in the Unit:  Daniels, the two Asian men, the owner of the car parked in Unit's parking space, and/or the individual on the Unit's lease.  [*Id.* at 91.]

53

Under these circumstances, it was objectively reasonable for TFO DeWald to ask questions to determine who may have still been inside Unit 907 and whether they may have posed a threat to the agents executing the warrant. And while asking Daniels where he lived might not, alone, reveal enough information to protect the officers entering the Unit from other individuals remaining there, the question must be considered in context. And in context, TFO DeWald's question made sense: he first needed to establish that Daniels was somehow connected to and familiar with Unit 907 before TFO DeWald could ask whether there was anyone else inside that might pose a danger. Indeed, before TFO DeWald could ask a follow-up question, Daniels stated that his girlfriend was inside the Unit, at which point TFO DeWald stopped all communications with him. ]Doc. 48 at 95.] Although TFO DeWald might have crafted his exchange with Daniels differently to avoid asking any direct questions about where he lived, "[a]n officer is not expected to craft a perfect question in the heat of the moment." *United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007). Faced with this "kaleidoscopic situation" rapidly playing out, TFO DeWald's question falls within the public safety exception. Accordingly,

the Court concludes that Daniels's response to the question about where he lived

should not be suppressed.[14]

### B.    Post-*Miranda* Statements

In his post-hearing brief, Daniels argues for the first time that the statement

he made to SA Highsmith after he was given his *Miranda* warnings should also be

---

[14] As noted, the Court need not reach the government's alterative argument that the inevitable discovery doctrine applies. But because of the advisory nature of this report and recommendation, the Court briefly addresses it to explain why it is a dead-end. In the government's view, the statement should not be suppressed because his response would have been inevitably discovered as part of the booking process. [Doc. 56 at 48-49.] The Court disagrees. The inevitable discovery doctrine is an exception to the exclusionary rule that allows the admission of evidence if the government establishes "a reasonable probability that the evidence in question would have been discovered by lawful means," and that the lawful means which made the discovery inevitable were being actively pursued prior to the illegal conduct of the officer. *See United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015). Though the doctrine may apply when a Fifth Amendment violation occurs, it seems to apply to the ***fruits*** of an inadmissible statement, not the statement itself. This is illustrated by *McKathan v. United States*, 969 F.3d 1213, 1232 (11th Cir. 2020), the case the government cites for the general proposition that the inevitable discovery doctrine can apply when a Fifth Amendment violation occurs. [Doc. 56 at 48.] In *McKathan*, the issue was whether evidence of child pornography that law enforcement found after the defendant made an un-Mirandized statement would have been inevitably discovered. *Id.* at 1231-32. The case did not hold (much less suggest) that the statement itself was somehow rendered admissible by the later-discovered contraband. And so it goes for Daniels's statement here. So, if the inevitable discovery doctrine had any application here, it would only be to rescue from suppression evidence derivative of Daniels's statement that he lived in Unit 907. It does not, however, render an otherwise inadmissible statement admissible simply because other evidence establishes the truth of the statement after the fact.

suppressed.[15]  [Doc. 51 at 11-12.]  He does not specify whether he is challenging the validity of his *Miranda* waiver, the voluntariness of his post-*Miranda* statements, or both.  But either way, the analysis here is the same.  *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017) ("Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver."), *report and recommendation adopted*, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).

In *Miranda*, the Supreme Court created a presumption that statements elicited during a custodial interrogation[16] are coerced, and thus not admissible at trial, unless a suspect is first advised of certain constitutional rights:  "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.  "The government has the burden of

---

[15] The government objects to the Court considering this issue because Daniels did not raise it until the post-hearing brief.  [Doc. 56 at 49 n.25.]  The Court believes that the record is adequately developed to address the voluntariness of Daniels's waiver and his post-*Miranda* statements, and therefore will proceed to address them.

[16] Again, the parties do not dispute that Daniels was subjected to a custodial interrogation for purposes of *Miranda*.

showing the knowing and intelligent nature of a waiver."  *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010).    This inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  And even if the government satisfies its burden of showing a valid *Miranda* waiver, the inquiry does not end there, because the government must still establish that the ensuing statements themselves were voluntary.  *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("Determining the admissibility of a postarrest confession requires a two-part inquiry.  We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary.") (citations omitted); *see also United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements.  Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness.").

Here, the parties do not dispute that SA Highsmith advised Daniels of his *Miranda* rights and that Daniels waived those rights.  [*See* Doc. 48 at 74-75.]

57

Daniels instead focuses entirely on the issue of voluntariness. He contends that SA Highsmith "preyed upon [his] vulnerability," knowing that Daniels was concerned about the safety of his girlfriend after hearing a woman nearby scream. [Doc. 51 at 11-12.]

The voluntariness inquiry focuses on "whether under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (quoting *United States v. Vera,* 701 F.2d 1349, 1364 (11th Cir. 1983)). Here, the record does not support Daniels's contention that SA Highsmith exploited the circumstances to coerce Daniels to either waive his rights or speak. After he heard the woman scream, Daniels told SA Highsmith he was concerned about his girlfriend's safety, and then made inculpatory statements about contraband the agents would find in Unit 907. [Doc. 48 at 74.] Realizing that Daniels was possibly going to incriminate himself, SA Highsmith advised Daniels of his *Miranda* rights. [*Id.*] Daniels waived his rights, and SA Highsmith followed up by asking Daniels to clarify what he had said, after which Daniels proceeded to make further inculpatory statements. [*Id.* at 75-76.] But Daniels fails to point to anything SA Highsmith did that amounted to intimidation, coercion, or deception.

Moreover, nothing about the surrounding circumstances suggests that Daniels faced any undue coercion. At the time Daniels waived his rights and identified the contraband in Unit 907, he was seated with his hands handcuffed so that he would be comfortable; none of the agents had their weapons drawn; and SA Highsmith did not yell at him or otherwise act in an intimidating, coercive, or deceptive fashion. [*Id.* at 81.] As a result, there is little to no support of Daniels's contention that SA Highsmith exploited him to extract a statement.[17]

---

[17] Daniels argues in his initial motion that all statements he made should be suppressed as fruit of the poisonous tree because he was "pulled from his bed in his underwear, gassed, removed from his home at gun point and detained by Agents in this case 'pursuant to a search warrant'"; he was "left sitting for hours until he was question [sic] *in seriatim* by multiple groups of agents from different agencies and different states"; and he "only made statement after the results of the search were revealed to him, thus the antecedent search [of Unit 907] or seizure 'induced' his confession or consent." [Doc. 51 at 12-13.] These, however, are facts from an unrelated case, erroneously inserted in the brief, as Daniels notes in his reply. [Doc. 64 at 28 n.14.] Indeed, Daniels made the statements at issue ***before*** knowing what the agents had seized from the unit; thus, he was not confronted with evidence to induce him to speak. And, as discussed, the search of Unit 907 was not unconstitutional and thus Daniels cannot be heard to make a fruit of the poisonous tree argument based on that search.

Likewise, Daniels's argument on reply that his statements should be suppressed because he had been arrested without probable cause misses the mark. [Doc. 64 at 30-31.] Even if Daniels were under arrest when he made his statements, there was probable cause (as set out in TFO DeWald's affidavit in support of the search warrant) to believe that he was engaging in criminal activity.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Daniels's motions to suppress evidence seized from the condo, statements he made during his encounter with law enforcement that day, and the contents of cell phones that were seized and later searched be **DENIED**.  [Docs. 23, 24, 25, 33, 34.]

I have now addressed all referred pretrial matters referred to me and I have not been advised of any impediments to the scheduling of a trial.  This case is thus **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 3rd day of September, 2024.

_____
JOHN K. LARKINS III
United States Magistrate Judge

60